2023 IL App (1st) 230231-U

SIXTH DIVISION
April 28, 2023

No. 1-23-0231

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County |
| | ) | |
| Petitioner-Appellee | ) | |
| | ) | |
| v. | ) | 17 CF 2709 |
| | ) | |
| CHRISTOPHER DIXON, | ) | Honorable |
| | ) | Joseph McGraw, |
| Defendant-Appellant | ) | Judge Presiding. |

_____

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Mikva and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant's motion to withdraw his guilty plea or, in the alternative, to reconsider sentence.

¶ 2                                        BACKGROUND

¶ 3    Defendant, Christopher Dixon, appeals from the denial of his amended motion to withdraw his guilty plea or, in the alternative, to reconsider his sentence. He argues that the trial court erred in barring his expert witness from testifying at the hearing on his amended motion and that the trial court abused its discretion in ultimately denying the amended motion.

¶ 4　　On November 15, 2017, Dixon was charged in a 26-count indictment for aggravated driving under the influence (DUI), reckless homicide, aggravated driving with a blood alcohol concentration greater than 0.08, aggravated fleeing or attempting to elude a police officer, aggravated reckless driving, aggravated driving while license revoked, and aggravated driving with license suspended.　Dixon was involved in a vehicle collision resulting in the death of Maria Lugo on September 9, 2017.

¶ 5　　Attorney Glenn Jazwiec represented Dixon.　On March 25, 2021, Dixon entered into an open plea to count three of the indictment that alleged aggravated DUI involving death. 625 ILCS 5/11-501(a)(2), (d)(1)(f) (West 2016).　Dixon was informed by the court that he was pleading guilty to a class two felony, but because of his criminal history he was eligible to be sentenced as a class X offender to 6 to 30 years' imprisonment.　Dixon indicated that he understood.　The factual basis for the plea was as follows:

> "On September 9th of 2017 at approximately 12:16 a.m. Rockford Police Officer Jones observed a white Chevrolet suburban fail to stop at a stop sign on Island Avenue and Clifton Avenue.
>
> Officer Jones also observed the vehicle failed to stop. In the area of Cypress Terrace, officers Jones activated his emergency lights in order to conduct a traffic stop on the vehicle.
>
> The vehicle stopped in the 1200 block of Cypress Terrace. Officer Jones approached the suburban on foot and Officer Jones was wearing his police uniform. As the officer neared the vehicle, the suburban, accelerated away from the traffic stop.
>
> The officer returned to his squad car and deactivated his emergency lights.

The officer drove around the area looking for the vehicle that fled from him. At approximately 12:18 a.m. as Officer Jones approached Clifton Avenue on Island Avenue, he observed the suburban had crashed. The suburban was overturned on its roof and there was extensive damage to the vehicle. There was a hole in the south side brick wall at 1626 Clifton Avenue and it appeared that the suburban struck the building. Red vehicle debris was near the white suburban.

Officer Jones observed a man who was later identified as this defendant inside the suburban. The defendant was able to crawl out of the vehicle and the defendant told Officer Jones that he was the only one inside the vehicle. Other officers arrived on scene along with medical personnel. Officers located a red Volkswagen Beetle approximately 75 yards from the suburban in the front yard of 825 Island Avenue.

The Volkswagen had substantial driver's side damage as a result of the crash of the defendant's vehicle. Officers located the sole occupant Maria Lugo inside the Volkswagen. The Rockford Fire Department arrived and Maria Lugo was pronounced deceased. An autopsy later revealed that she had died from blunt force trauma to the head, neck and chest sustained from the vehicle crash.

A warrant was obtained to take a sample of the defendant's blood. A registered nurse at Rockford Memorial Hospital collected a legal blood draw from the defendant. The defendant's blood was later analyzed by forensic scientists and it was determined that the blood alcohol concentration of the defendant was .091."

The remaining counts were dismissed.

¶ 6    At the sentencing hearing on May 10, 2021, the court heard from the victim's family

members and Dixon's mother. Dixon made a lengthy statement and told the court that:

> "I'm here today to address the, a decision, a decision I made in September of 2017 and I'm here to pay full responsibility for my, I'm here to pay full responsibility for my actions in this situation.
>
> Like I've said, like Mr. Glenn read, I don't 100 percent feel good about it. I'm sick over it. I'm ashamed. It's even hard for me to be up here and talk about it because you know, as a family we've been through this too as well so everything they said I respect and I understand. With 100 percent honesty, I'm sorry."

After considering all of the factors in aggravation and mitigation, as well as the PSI and the testimony of the witnesses, the court sentenced Dixon to 30 years' imprisonment. The court noted that Dixon had three prior DUI convictions and had been given numerous opportunities for rehabilitation.

¶ 7    On May 28, 2021, Attorney Christopher Taylor filed a motion to substitute attorneys. On June 8, 2021, Taylor filed a motion to withdraw Dixon's guilty plea and a motion to reconsider sentence. Thereafter, on November 30, 2021, Taylor filed an amended motion to withdraw Dixon's guilty plea and reconsider sentence. In the motion, Dixon alleged that he should be allowed to withdraw his guilty plea because Attorney Jazwiec provided ineffective assistance of counsel that resulted in Dixon's plea being not knowingly or voluntarily entered. Dixon alleged that Jazwiec failed to obtain an expert to refute the blood alcohol concentration (BAC) test result and told Dixon that an expert would not be helpful to his case because the expert would likely say his BAC was above .08 at the time he was driving. Dixon also alleged that Jazwiec failed to challenge the crime lab results from the BAC test. Dixon attached a report and curriculum vitae

from Dr. James O'Donnell, which listed Dr. O'Donnell's qualifications, publications and opinions based on the facts provided to him by Taylor. In a written report, Dr. O'Donnell opined, and stated he would testify at a trial to the following:

"1. I do not challenge the alcohol report value of 0.09lg/dL. However, the result is of no value and can not be extrapolated to the time of the traffic stop 5 hours earlier. There is no way to accurately calculate, extrapolate, or even estimate the blood alcohol concentration (BAC) at the time of the traffic stop.

2. Neither the State nor its experts can scientifically prove/state that the BAC was at or above 0.08g/dL at the time of driving.

3. Alcohol was being absorbed from Mr. Dixon's gut at the time of the traffic stop. This is predictable based on the timeline, and known absorption rates of alcohol. It is also clinically evident in the lack of any impairment which can be concluded from Officer Jones' notation in the police report.

4. Retrograde extrapolation can not be performed unless an assumption of "at or beyond" peak alcohol level. This same language appears in the Illinois State Police Lab Procedures manual. That means, all the alcohol that was consumed into the gut was absorbed from the gut into the blood."

¶ 8    On March 16, 2022, the State filed a response to Dixon's motion arguing that his motion should be denied. The State's subsequently filed an amended response requesting that the court bar Dr. O'Donnell's testimony. The case was set for hearing.

¶ 9    At the April 8, 2022, hearing on Dixon's motions, attorney Jazwiec testified that he and Dixon discussed whether Dixon should plead guilty or go to trial and discussed the "pros and

cons." Jazwiec stated that he recommended that Dixon plead guilty but Jazwiec "always [tells] the client it's their decision to make" and "ultimately, [Dixon] made the decision." Jazwiec testified that he also had discussions with Dixon about whether an expert witness would be beneficial to Dixon's case. They discussed that the BAC test was the primary evidence of intoxication in this case and "whether or not the 0.09 result would be challenged with expert testimony." Jazwiec stated that "ultimately, based upon all of the results, it was decided not to retain an expert or to have an expert based on what the blood alcohol was, the timing which it was taken, as opposed to the time in which he was stopped and arrested." Based on his experience, Jazwiec did not believe an expert would help because the expert would likely say Dixon's BAC was higher at the time of the accident. Jazwiec testified that Dixon never told Jazwiec that he wanted an expert retained and that he did not recall whether Dixon or his girlfriend Stacy Teraza offered him money to hire an expert.

¶ 10    Jazwiec also testified that throughout the plea process, Dixon never indicated to the court that he did not wish to plead guilty. Dixon never indicated to Jazwiec that he did not want to plead guilty. Dixon was given all of the proper plea admonishments including being admonished that he had a right to a trial.

¶ 11    Stacy Teraza testified that she was Dixon's girlfriend. In September or October of 2020, she had a phone conversation with Jazwiec where she told Jazwiec that Dixon wanted "to know about getting an expert in the case, particularly in regard to the blood alcohol content level and in regards to the possibly contaminated blood alcohol thing," Jazwiec told Teraza that he did not think it was necessary to obtain an expert and that "he could bring it up himself during trial." Teraza stated that she offered Jazwiec money to obtain an expert. She stated that Dixon did not

6

want to plead guilty. Prior to the plea, Teraza consulted another attorney about obtaining an expert. She ultimately contacted Taylor who retained Dr. O'Donnell. Terza paid $4,000 for Dr. O'Donnell to prepare his written report.

¶ 12 After Teraza testified, Taylor wanted to call Dr. O'Donnell. The court indicated that it still had not decided about whether it was going to allow Dr. O'Donnell to testify. Taylor then called Dixon.

¶ 13 Dixon testified that he pled guilty to count 3, one of the 26 counts he was charged with in this case. Prior to pleading guilty, his case had been set for trial in October 2020. When he appeared in court that day, he had concerns about Jazwiec's effectiveness. Dixon felt unprepared for trial and discussed obtaining an expert to testify about his blood alcohol content with Jazwiec. Jazwiec told Dixon that an expert would not be helpful to his case. Dixon agreed that had he been aware that an expert would testify that the blood alcohol content evidence was unreliable, his "decision would have been different."

¶ 14 After Dixon's testimony, the court stated that "we're at the juncture where I decide whether or not hearing from your expert would be informative for the Court in order to decide whether or not Mr. Jazwiec's performance deviated below acceptable standards." After hearing from Taylor and the State, the court continued the case to May 18, 2022, for its decision on whether Dr. O'Donnell would be allowed to testify.

¶ 15 On May 17, 2022, the court entered a written order denying Dixon's amended motion to withdraw his guilty plea or, in the alternative, to reconsider sentence. The court found that Dixon was advised of the nature of an open plea and indicated that he understood, including the nature of the charge, the sentencing range and all of the attendant rights he would be giving up

when he pled guilty. Dixon chose to avail himself of the bargain of the plea agreement that resulted in the dismissal of other pending charges and the dismissal of a petition to vacate his felony probation. The evidence was insufficient to show that Jazwiec provided ineffective assistance of counsel because "merely focusing on what might or could have been done by hiring an expert in one case ignores the totality of the circumstances of this defendant's total criminal liability exposure." On May 18, 2021, the court entered an order barring Dr. O'Donnell from presenting expert testimony.

¶ 16    Dixon filed a timely notice of appeal.

¶ 17                                    ANALYSIS

¶ 18    Dixon first argues that the trial court erred when it refused to allow him to present expert testimony at the hearing on his amended motion to withdraw his guilty plea and reconsider sentence.

¶ 19    Generally, expert witnesses are permitted to testify if their experience and qualifications afford them knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. *People v. Enis*, 139 Ill. 2d 264, 288 (1990). A trial court is given broad discretion when determining the admissibility of expert testimony and should consider the necessity and relevance of the expert testimony in light of the facts of the case before admitting it. *Id*. at 290. A trial court's decision on whether to allow expert testimony will not be reversed absent an abuse of discretion. *Id*. at 288.

¶ 20    Dixon cites *People v. Pellegrini*, 2019 IL App (3d) 170827, for the proposition that the testimony of Dr. O'Donnell would have been helpful to the determination of whether Jazwiec's failure to call an expert constituted ineffective assistance. In *Pellegrini*, the defendant filed a

postconviction petition alleging ineffective assistance of counsel that was based on information "absent from the original appellate record, and thus could not have been raised on direct review." The court found that because the matters were outside the record, the issue was properly raised on collateral review. *Id* ¶ 50.

¶ 21    *Pellegrini* is distinguishable from the facts of the instant case. Although the record in this case does not contain Dr. O'Donnell's live testimony, it does contain Dr. O'Donnell's written report that states his opinions and proposed live testimony. The trial court was equipped with this report in deciding whether Dr. O'Donnell's live testimony was necessary to rule on Dixon's amended motion.

¶ 22    *People v. Witte*, 115 Ill. App. 3d 20 (1983), on which Dixon also relies, is likewise distinguishable. *Witte* involved a posttrial motion alleging juror bias. The trial court refused the defendant's request for an evidentiary hearing. According to the defendant, the hearing would have allowed the trial judge to observe the juror's demeanor when questioned about her relationships with people in the sheriff's office. *Id.*

¶ 23    Here, the court held an evidentiary hearing on Dixon's amended motion and heard live testimony from Jazwiec, Stanza and Dixon. The court also possessed Dr. O'Donnell's written report and was aware of Dr. O'Donnell's opinions before deciding to deny Dixon's amended motion. Dr. O'Donnell's live testimony would be duplicative of the opinions stated in his written report.

¶ 24    Other than relying on *Pellegrini* and *Witte*, Dixon fails to explain how the court abused its discretion in not allowing Dr. O'Donnell to testify at the hearing on his amended motion to withdraw his guilty plea or, in the alternative, to reconsider sentence. Based on the record in this

case, we cannot say that the trial court abused its discretion in excluding Dr. O'Donnell's live testimony at the hearing on Dixon's amended motion.

¶ 25    Dixon also argues that the trial court erred in denying his amended motion to withdraw his guilty plea and to reconsider sentence.  He urges that he received ineffective assistance of counsel because Jazwiec failed to investigate and obtain an expert on blood alcohol concentration, especially because there was no other evidence of his impairment.  Dixon claims that he would not have pled guilty but for counsel's ineffectiveness.

¶ 18    A respondent has no absolute right to withdraw his guilty plea. *People v. Delvillar*, 235 Ill. 2d 507, 520 (2009). To withdraw a guilty plea, a respondent must demonstrate that: (1) the plea was entered on a misapprehension of the facts or law, or (2) her agreement to the plea was the result of misrepresentations by counsel, the State, or another authority. *People v. Davis*, 145 Ill. 2d 240, 244 (1991). "[T]he burden is on the [respondent] to establish that the circumstances existing at the time of the plea, judged by objective standards, justified the mistaken impression." *Id.* The decision to grant or deny the motion to withdraw a guilty plea lies with the circuit court and is reviewed for an abuse of discretion. *Delvillar*, 235 Ill. 2d at 519.

¶ 19    Under the sixth amendment (U.S. Const., amend. VI), a criminal defendant has the right to receive effective assistance from defense counsel at all critical stages of the criminal case, including the guilty plea hearing. *People v. Brown*, 2017 IL 121681, ¶ 25.  To prevail on a claim of ineffective assistance, the defendant must prove the two elements in *Strickland v. Washington*, 466 U.S. 668 (1984), namely, that defense counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced by the substandard performance. *Brown*, 2017 IL 121681, ¶ 25.  For purposes of the second prong, a guilty-plea defendant "must

show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* ¶ 26 (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). We may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 20    In *Hill v. Lockhart*, 474 U.S. at 53, the defendant pleaded guilty to first degree murder and theft. Two years later he challenged his guilty plea as "involuntary" on the ground that he had received ineffective assistance of counsel. Hill argued that his attorney had failed to advise him that, because of his prior felony conviction, he would have to serve one-half of his sentence in order to become eligible for parole. *Id.* With respect to the second prong of *Strickland*, the United States Supreme Court held in pertinent part:

> "In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial."
>
> *Lockhart*, 474 U.S. at 59-60; *People v. Grey*, 2012 IL App (4th) 110455, ¶ 49.

¶ 26    *Hill* explained *Strickland*'s second prong prejudice in terms of the likely effect that the additional evidence would alter defense counsel's recommendation to plead guilty. In this case,

we have the benefit of Jazwiec's testimony at the hearing on Dixon's amended motion. Jazwiec testified that nothing in Dr. O'Donnell's report would have changed his recommendation to Dixon to enter a plea of guilty. Jazwiec explained that prior to Dixon entering an open plea, he and Dixon discussed the evidence, his options, and the pros and cons. Dixon's BAC was 0.09 five hours after the accident. Jazwiec knew that defendant had another case with mandatory consecutive Class X sentencing and was on bond for another aggravated DUI when he committed the present offense. Jazwiec stated that given the evidence and the fact that Dixon had other pending cases, he recommended that Jazwiec plead guilty. Jazwiec stated that he made it clear to Dixon that the ultimate decision of whether to plead guilty or to go to trial was Dixon's. Jazwiec also stated that during his plea, Dixon never indicated to the court that he did not want to proceed, never indicated that he wanted extra time to hire an expert witness, and never stated that he wished to proceed to trial.

¶ 27    Jazwiec explained why he believed that an expert would not be helpful to Dixon's case. Jazwiec did not believe Dr. O'Donnell's opinion to be exculpatory in any way because Dr. O'Donnell's conclusion was not that Dixon's BAC was under the legal limit at the time of the offense. Jazwiec understood that Dixon would have had "elimination for over three and a half hours to get to 0.09." In addition, Dr. O'Donnell did not "challenge the alcohol report value of 0.09lg/dL." Dr. O'Donnell's conclusion was merely that "we have no idea what it is because theoretically retrograde extrapolation is not something that can be done or relied upon."

¶ 28    Dixon cites *People v. Floyd*, 2014 IL App (2d) 120507, ¶ 9, in support of his argument that Dr. O'Donnell's expert opinion would have changed the result at trial. In *Floyd*, the defendant was arrested at approximately 9 p.m. and given a breath test at 10:30 p.m. His BAC

was 0.069. *Id.* The State introduced expert testimony on extrapolation to show that the defendant's BAC was between 0.082 and 0.095 at approximately 9 p.m. when she was stopped. *Id.* On appeal, the defendant argued that the extrapolation evidence was improperly admitted, because the expert did not have sufficient information to conduct a reliable extrapolation. *Id.* ¶ 13. Based on the specific facts of that case, this court held that, because the expert's opinion on extrapolation was unreliable, the prejudicial effect of admitting that opinion substantially outweighed its probative value. Therefore, the trial court abused its discretion in admitting it. *Id.* ¶ 20.

¶ 29     Dixon's reliance on *Floyd* is misplaced. In *Floyd*, the defendant's BAC result was *under* the statutory limit, and the State sought to introduce extrapolation evidence to show his BAC was above the limit when defendant was driving. In the instant case, Dixon's BAC was above the legal limit, at 0.09, five hours after the accident. Regardless of whatever extrapolation evidence Dr. O'Donnell would have provided, Dixon's BAC, taken five hours after the accident was direct evidence that Dixon's BAC was over the statutory limit at the time he was driving, irrespective of impairment.

¶ 30     As the State acknowledges, Dixon could have argued that he consumed the alcohol so close to the time of the traffic stop that he would not yet have absorbed enough of it to be considered under the influence. However, for Dr. O'Donnell's opinion to be helpful on this issue, it would be necessary to know what Dixon drank, how much, and when he started drinking and stopped drinking. Dixon admitted to his attorney Taylor that he could not remember how much Tequila he consumed or when he started drinking. Dr. O'Donnell's report shows that he was aware that "Christopher Dixon was drinking Tequila in his SUV that evening, up to the time the

RPO started their pursuit. He threw away the bottle after the first encounter with Officer C. Jones. You further advised that Christopher could not remember how much alcohol he consumed and when he started drinking that evening."

¶ 31    We find that Dixon has failed to establish the necessary prejudice under the second prong of *Strickland*.  Jazwiec testified at the hearing on the motion that had he been privy to Dr. O'Donnell's opinions prior to the plea hearing, his recommendation to Dixon that he plead guilty would not have changed.  In addition, we find that the opinions contained in Dr. O'Donnell's report would likely not have changed the result at trial.

¶ 21                                    CONCLUSION

¶ 22    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 23    Affirmed.